IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THE CHARTER OAK FIRE INSURANCE
COMPANY, a Connecticut corporation;
TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA, a Connecticut
corporation; and THE TRAVELERS
INDEMNITY COMPANY, a Connecticut
corporation,

                Plaintiffs,

                3:10-cv-01505-PK
                FINDINGS AND
                RECOMMENDATION

INTERSTATE MECHANICAL, INC., an
Oregon corporation; CONTINENTAL
WESTERN INSURANCE COMPANY, an
Iowa corporation; and GLACIER
CONSTRUCTION PARTNERS, LLC, a
Montana limited liability company,

                Defendants.

PAPAK, Magistrate Judge:

        Plaintiffs The Charter Oak Fire Insurance Company, Travelers Property Casualty

Company of America, and The Travelers Indemnity Company (collectively "Travelers") bring

this declaratory judgment action under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201,

against Interstate Mechanical Inc. ("Interstate"), Glacier Construction Partners, LLC ("Glacier")

Page 1 - FINDINGS AND RECOMMENDATION

and Continental Western Insurance Company ("Continental") to determine insurance coverage

obligations.   Continental asserts cross claims for declaratory relief against Interstate also

involving coverage obligations.  This court has diversity jurisdiction under 28 U.S.C. §1332.

Now before the court are a number of motions:

• Glacier's motion for transfer of venue to the United States District Court for the District

  of Montana, Missoula Division, or alternative motion to dismiss for lack of personal

  jurisdiction (#54);

• Travelers' motion to file a third amended complaint (#57);

• Continental's motion to amend its cross-claim (#62);

• Glacier's motion to vacate a default judgment against Interstate (#73);

• Travelers' motion to strike portions of a declaration filed in support of Glacier's motion

  to transfer (#79), informally joined by Continental in its response briefing (#81);

• Glacier's oral motion for the court to decline to exercise declaratory relief jurisdiction

  over this action; and

• Travelers' and Continental's joint motion to strike portions of declarations filed by

  Glacier in support of its oral motion (#111, #117).

For the reasons described below, Glacier's motion to transfer venue or dismiss should be denied,

Travelers' motion to amend should be granted, Continental's motion to amend should be granted,

Glacier's motion to vacate should be denied, Travelers' and Continental's first motion to strike

should be denied in part as moot and denied in part on the merits, Glacier's oral motion should

be denied with leave to renew at a later stage in the proceedings, and Travelers' and

Continental's second motion to strike should be denied as moot.

Page 2 - FINDINGS AND RECOMMENDATION

## BACKGROUND

Although the factual history of this case is relatively straightforward, the case also

has a highly relevant but complicated procedural history that I describe in detail.

## I.        The Project and Glacier

In 2001, Donald Abbey, a wealthy real-estate developer from Southern California,

purchased Shelter Island, a small island in Flathead Lake in rural Montana, to build a personal

residence there.  Mr. Abbey bought part of the island through an entity called Abbey/Land LLC

("Abbey/Land"), of which he is the sole member.  (McCracken Decl., #85, Ex. 1); (McCracken

Decl., #85, Ex. 2, at 8) (hereinafter Glacier Dep., with pagination from Ex. 2).  Abbey/Land

began to build a large residence on the island, but apparently fell into a dispute with the

Montana-based architecture firm and Montana-based mechanical contractor who initially worked

on the project.  (Tygart Decl., #84, ¶7.)  In 2003, Mr. Abbey formed Glacier to act as a new

general contractor for the project.  (Glacier Dep., at 7); (Baldi-Woolhouse Decl., #71, ¶2.)  Mr.

Abbey was also the sole member of Glacier. (Glacier Dep., at 6.)  Glacier hired Nate Steinbeck, a

contractor who ordinarily lives in Santa Barbara, California, as a project manager for the

construction.[1] (Glacier Dep., at 7, 78.)  Glacier also utilized the services of William Matteson,

who lives in San Francisco, California, as a CFO, and Brenda Baldi-Woolhouse, who lives in

Montana, as an assistant to Steinbeck and Matteson.  (Glacier Dep., at 6, 7, 16.)  Matteson stated

that Glacier formerly had about a dozen employees, all of whom lived and worked in Montana.

(Matteson Decl., #90, ¶1.)  Matteson and Baldi-Woolhouse confirm that Glacier's only

_____

[1]Steinbeck lived in Montana while he was working on the project.  (Steinbeck Decl., #91,
¶2.)

Page 3 - FINDINGS AND RECOMMENDATION

construction project was the residence on Shelter Island in Montana.  (Glacier Dep., at 17.)

## II.      Glacier and Interstate

### A.      Design Review Contract

Glacier initially became aware of Interstate, a now-defunct Portland, Oregon HVAC, plumbing, and electrical contractor, in 2003 when Steinbeck heard about Interstate from another subcontractor, Northwest Timbering Structures.  (Steinbeck Decl., #91, ¶4.)  Steinbeck met Roger Lemon of Interstate in Montana and learned that Interstate was seeking work in Montana. *Id.*  Steinbeck asked Lemon about Interstate providing expert testimony in Abbey/Land's dispute with its previous architect and contractor.  (Tygart Decl., ¶7.)  At that time, Glacier was apparently aware that Interstate was an Oregon company located in Portland.  *Id.*  Steinbeck then traveled to Interstates' office in Portland to discuss the project.  *Id.*

In October 2004, Glacier apparently contracted with Interstate to perform a pre-construction analysis of the HVAC and plumbing systems on the main residence, including a design review of work performed by others and value engineering options to complete the work, and also contracted to provide expert witness testimony and consulting concerning Abbey/Land's dispute with its architect.[2]  (Tygart Decl., ¶9); (McCracken Decl., #85, Ex. 3.)  Interstate and Glacier negotiated the contract through emails between Steinbeck in Montana and Roger Lemons at Interstate's office in Portland.  (Glacier Dep., at 28-29); (McCracken Decl., #85, Ex. 3.) The value of that contract was $31,545. (McCracken Decl., #85, Ex. 3.)

---

[2] The record does not appear to contain the actual signed contract, but it does contain an unsigned document containing general terms of the agreement dated August 24, 2005 and an email including more specific proposals from October 18, 2044.  Glacier does not dispute that a contract was executed.

Page 4 - FINDINGS AND RECOMMENDATION

Interstate conducted the design review, which involved visiting the construction site and reviewing architectural drawings and specifications in Montana, as well as preparing a cost analysis and completing a value engineering proposal in their Portland office.  (Glacier Dep., at 24-26.)  Glacier apparently knew that Interstate was performing much of the design review in Portland.  (Tygart Decl., ¶9.)

### B.    Main House Subcontract

Interstate and Glacier eventually entered into a second agreement in June 2006, this time for almost $1.4 million of HVAC and plumbing design and installation work on the main house on Shelter Island.  (Tygart Decl., ¶¶ 10, 23) (Cushman Decl., #55, Ex. D.)  Baldi-Woolhouse, the Glacier administrator, states that she participated in drafting the subcontract in Montana.  (Baldi-Woolhouse Decl., #71, ¶3.)  The Billings, Montana law firm of Holland and Hart, and Steinbeck also helped draft the subcontract.  (Steinbeck Decl., #91, ¶3.)

Steinbeck asserts that "[t]he subcontract was primarily negotiated in Montana." (Steinbeck Decl., #91, ¶5.)  However, it is undisputed that some of Glacier's negotiation of the subcontract occurred in Oregon. Steinbeck and Abbey both traveled to Portland in February 2006 for an all-day meeting in Interstate's office to discuss the scope of that subcontract with Interstate and several of its sub-subcontractors.  (Tygart Decl., ¶¶13-14); (Glacier Dep., at 22.)  Steinbeck also traveled to Portland for a meeting with Interstate in June 2006 to finalize the scope and pricing of the subcontract.  (Tygart Decl., ¶¶13,15); (Glacier Dep., at 23.)  In addition to these in-person meetings in Oregon, Steinbeck negotiated with Interstate through written communications such as email.  (Glacier Dep., at 23.)  During the negotiations, Steinbeck was aware that Interstate was an Oregon business and that Interstate would sub-subcontract with Oregon

companies such as MEP Consulting Engineers and Siemens.  (Glacier Dep., at 24); (Tygart Decl., ¶¶17-19.)  Glacier also received mechanical submittals from Interstate showing that Interstate would provide equipment and supplies from various Oregon companies.  (Tygart Decl., ¶21); (Glacier Dep., at 49-55.)

Glacier's Baldi-Woolhouse declares generally that "[t]he performance for the subcontract took place in Montana."  (Baldi-Woolhouse Decl., #71, ¶3.)  Similarly, Steinbeck declares that "[t]he actual contracting work was done by [Interstate] in Montana."  (Steinbeck Decl., #91, ¶5.)  Although the parties do not dispute that the physical construction work and installation of equipment occurred on-site in Montana, evidence shows that other aspects of Interstate's performance of the subcontract took place in Oregon.  For example, Interstate created and revised several sets of mechanical and plumbing drawings in Portland.  (Glacier Dep., at 35, 44-46); (Tygart Decl., ¶20.)  Interstate also did the majority of the detailing – creating the initial shop drawings required for fabrication– and fabrication of ductwork and piping in Portland. (Glacier Dep., at 42-43); (Tygart Decl., ¶20.)  And Interstate performed all the budgeting and procurement of materials required to perform the subcontract in its Portland office.  (Tygart Decl., ¶20.)

There is no dispute that Glacier also communicated regularly with Interstate in Portland regarding change orders, requests for information, transmittal letters, and payment.  For instance, Glacier and Interstate negotiated 78 written modifications of the subcontract, called change orders, 60% of which were initiated by Glacier.   (Tygart Decl., ¶23); (Glacier Dep., at 32-34.)  These change orders increased the value of the work called for in subcontract by almost $1 million.  (Tygart Decl., ¶23.)  Negotiation of the change orders involved written or electronic

communication between Glacier in Montana and Interstate in Oregon, including preparation of

new drawings and pricing.  *Id.*   In addition, the record shows literally hundreds of emails

exchanged between employees of Interstate and its sub-subcontractors in Oregon and employees

of Glacier in Montana.  (McCracken Decl., #85, Ex. 5); (Glacier Dep., at 58-76.)  Finally, Glacier

issued regular monthly payments to Interstates office in Portland from July 2006 until Glacier left

the job site in 2009.  (Tygart Decl., ¶24); (Glacier Dep., at 40-41.)

> **C.**        **Boat House Subcontract**

In addition to the 2004 design review and the 2006 main house subcontract, Glacier

and Interstate entered into a subcontract in July 2006 for Interstate to modify the boathouse's

water system and controls.  (Tygart Decl., ¶11); (Glacier Dep., at 29-30.)  The boathouse

subcontract also involved approximately 18 transmittals and three change orders, which

increased the value of that contract from around $31,000 to about $42,000.  (Glacier Dep., at 29-

31.)

**III.        Interstate's Insurance**

Part of Interstate's subcontract with Glacier required Interstate to obtain and furnish

evidence of various insurance, including comprehensive general liability, comprehensive

automobile liability, workers' compensation, property coverage for tools and equipment, and at

Glacier's option, pollution liability coverage.   (Cushman Decl., #55, Ex. D at 26.)    The

subcontract specified that the insurance should include Glacier "and its employees, agents and

members," Abbey/Land "and its employees, agents and members," and Donald G. Abbey as

additional insureds.  *Id.*, Ex. D at 27.  To satisfy those requirements, Interstate used the services

of Anchor Insurance- Portland ("Anchor"), an insurance broker located in Portland.  (Tygart

Decl., ¶4.)  Anchor and Interstate negotiated the required insurance policies in Portland and

Anchor provided proof of insurance coverage when requested.  *Id.* at ¶¶5,6.  Glacier attached

copies of the certificates of insurance issued along with its amended answer in this action.[3]

(Amend. Ans., #53, Ex. B.)

IV.        **Procedural History**

Besides the present action in this court, the complex procedural history relevant to

this case involves three separate actions in Montana: an arbitration initiated in July 2009

("Arbitration"), a state court suit in Flathead County initiated in September 2009 ("Flathead

County case"), and another state court action in Lake County initiated in September 2011 ("Lake

County case").  I discuss the progress of these actions roughly chronologically to illustrate the

connections between them.

In July 2009, Interstate initiated the Arbitration in Montana against Glacier to recover

money allegedly due for work performed on the Abbey residence.[4]  (2nd Amend. Compl., #40,

¶17.)  Several months later, in September 2009, Abbey/Land and Glacier filed a separate state

court action in Flathead County, Montana against Interstate and a number of other

subcontractors.  About seven months later, in April 2010, Abbey/Land and Glacier filed a First

Amended Complaint in the Flathead County action alleging claims for negligence and private

nuisance, negligent misrepresentation, breach of contract, breach of the implied covenant of good

---

[3] For simplicity, I refer to these policies collectively as the Travelers policies, although
among them are also several policies provided by Continental.

[4] The subcontract between Interstate and Glacier provided that all claims or controversies
arising under the contract would be arbitrated in Missoula, Montana and would be governed by
Montana law.  (Cushman Decl., #55, Ex. D, at 18, 20.)

faith and construction fraud, misconduct warranting punitive damages, and declaratory and injunctive relief in the form of a stay of the Arbitration.  (2nd Amend. Compl., #40, Ex. B.) Abbey/Land and Glacier alleged that Interstate had installed a wastewater treatment system that improperly discharged septic waste, a heat pump system that violated various permit requirements and regulations, and a make-up air system that caused pipes to burst, damaging the property.  *Id.*  Just a few months later, in July 2010, Glacier reiterated these same allegations in the form of Arbitration counterclaims against Interstate. (2nd Amend. Compl., #40, Ex. C.)

Interstate tendered both the First Amended Complaint in the Flathead County case and the counterclaims in the Arbitration to Travelers, demanding defense and indemnification. (2nd Amend. Compl., #40, ¶¶15, 20.)   Travelers denied coverage, but agreed to defend in both actions under a reservation of rights.  *Id.* at ¶¶16, 21.  It also appears that Interstate tendered these actions to Continental as well, which also insured Interstate.  (Answer, #18, at 6); *supra*, at n.3.

Before any further dispositions occurred in either the Arbitration or the Flathead County case, on December 12, 2010, Travelers brought the present action against Interstate, Continental (which issued insurance policies to Interstate), and John Does 1-5 (representing others who might claim coverage under the Travelers policies) seeking: (1) a declaration that Travelers had no obligation to defend or indemnify Interstate in the Arbitration or the Flathead County case; (2) recoupment of defense costs; or (3) allocation of defense and indemnity costs, to the extent that Travelers had such obligations.  (Complaint, #1.)   Continental also filed cross-claims against Interstate on February 4, 2011, seeking a declaration that it had no duty to defend or indemnify Interstate in the Arbitration or the Flathead County case.  (Answer, #18.)   After Interstate failed to answer, the district court entered default judgments against Interstate in favor

of Travelers and Continental, in February and April 2011, respectively.  (Default Judgment, #26,

32.)  The default judgment in favor of Travelers only resolved Travelers' claim for declaratory

relief, but did not address its claim for recoupment of defense costs.

A few months earlier, in January 2011, Glacier prevailed in the Arbitration over

Interstate, receiving an award of over $414,000 on its arbitration counterclaims.  (Cushman

Decl., #55, Ex. A.)  Soon thereafter, on March 4, 2011, the U.S. District Court for the District of

Montana, Missoula Division, entered a judgment in favor of Glacier against Interstate for that

amount based on the Arbitration award.  *Id.*  Within two weeks, Abbey/Land sent Glacier (who at

the time was still Abbey/Land's co-plaintiff in the Flathead County case) a demand letter

explaining that the Arbitration award demonstrated Abbey/Land had overpaid Glacier by at least

$414,000 for services rendered, and requesting Glacier pay $414,000 or any proceeds it

recovered under Interstate's insurance policies. (2nd Amend. Compl., #40, ¶30, Ex. D.)  In turn,

Glacier tendering Abbey/Land's demand for $414,000 to Travelers, stating that Glacier's liability

to Abbey/Land was reasonably clear and that Travelers had a duty to indemnify Glacier as an

additional insured of Interstate's Travelers policies.  (2nd Amend. Compl., #40, ¶31, Ex. E.)

Apparently in response to Glacier's tender of Abbey/Land's demand, in July 2011,

Travelers filed a Second Amended complaint in this federal action to add Glacier as a defendant.

The new pleading acknowledged that judgment had already been entered on Travelers' claim for

a declaration as to its obligations *vis a vis* Interstate.  In addition, though, Travelers sought a

declaration that it had no obligation to indemnify Glacier for any liability based on acts or

omissions of Interstate (what Travelers calls the "Abbey/Land Claims"), including the conduct

referenced in the Abbey/Land's demand, i.e. the issues resolved in the Arbitration against

Interstate.[5]  (2nd Amend. Compl., #40, ¶¶3,33.)   Alternatively, Travelers sought allocation of

those indemnity costs between Travelers, Glacier, and Continental.  *Id.* at ¶36.

A little more than two months later, on September 23, 2011, Abbey/Land filed a

Second Amended Complaint in the still-ongoing Flathead County case.  (Cushman Decl., #55,

Ex. B.)  This Second Amended Complaint made significant changes in the suit.  Most

importantly, it removed Glacier as a plaintiff and added Glacier instead as a defendant.[6]  As a

consequence, the Second Amended Complaint also removed the previous breach of contract

claim and other contract-related claims, ostensibly since Glacier (and not Abbey/Land) had

executed the contracts with the various subcontractors.  Finally, the Second Amended Complaint

added a claim for declaratory relief seeking a finding that the Arbitration was conclusive upon

Interstate and Glacier and that Glacier was collaterally estopped from relitigating issues

determined in the Arbitration.  Glacier represents– but does not adduce evidence to show– that it

tendered defense on the Second Amended Complaint in the Flathead County case to Travelers,

Continental, and Glacier's other insurers, but only Continental and one of the Travelers

defendants (The Travelers Indemnity Company) agreed to defend under a reservation of rights.

(Br., #54, at 4.)

Within a week after Glacier inexplicably switched from a plaintiff to a defendant in

the Flathead County case, on September 29, 2011, Glacier initiated a new state court action in

---

[5] At that time, Glacier was not a defendant in any of the relevant actions.  It had not yet been sued by Abbey/Land in the Flathead County case and the Arbitration had already been concluded.  This accounts for the fact that Travelers' claim does not seek a declaration of no obligation to indemnify *and defend*, since at that point Glacier was not a defendant.

[6] Travelers views this as a "corporate shell game" by Glacier and Abbey/Land, since both are controlled by the same individual, Donald Abbey.

Page 11 - FINDINGS AND RECOMMENDATION

Lake County, Montana.  The First Amended Complaint in that case, filed approximately a month

later, names the following defendants: Interstate, all the other subcontractors also named as

defendants in the Flathead County case, Abbey/Land, Anchor Insurance-Portland (Interstate's

insurance broker), Travelers, and other alleged Glacier insurers such as Commerce & Industry

Insurance Company, Illinois National Insurance Company, American Safety Indemnity

Company, and James River Insurance Company.  (Cushman Decl., #55, Ex. C.)  The Lake

County suit seeks a declaration that all insurer defendants have a duty to defend and indemnify

Glacier against the claims made by Abbey/Land in the Flathead County case's Second Amended

Complaint, and that all non-insurer defendants (i.e.,the subcontractors) have a duty to defend and

indemnify Glacier to the extent of their own negligence in causing the losses alleged in the

Second Amended Complaint.  *Id.* at ¶¶28,29.  In other words, Glacier's First Amended

Complaint in the Lake County case seeks to resolve the entire universe of insurance coverage

issues implicated by Abbey/Land's claims against Glacier in the Second Amended Complaint

from the Flathead County case, including among them the more limited subset of coverage issues

involving Travelers and Continental that are now the focus of the instant action before this court.

## LEGAL STANDARDS

I.      **Motion to Dismiss for Lack of Personal Jurisdiction or Venue, or Motion to**

        **Transfer Venue**

        "In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, the

plaintiff bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539

F.3d 1011, 1015 (9th Cir. 2008), citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir.1990).  In

evaluating the defendant's motion, "[t]he court may consider evidence presented in affidavits to

assist it in its determination and may order discovery on the jurisdictional issues." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001), *citing Data Disc, Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).  If the court decides the motion based on the pleadings and affidavits submitted by the parties without conducting an evidentiary hearing, "the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Id.*, *quoting Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).  In the absence of such an evidentiary hearing, the court accepts uncontroverted allegations contained within the plaintiff's complaint as true, and resolves conflicts between statements contained within the parties' affidavits in the plaintiff's favor. *See id.*

Motions to dismiss for improper venue are governed by Federal Civil Procedure Rule 12(b)(3).  In deciding a motion brought under Rule 12(b)(3), the court is not required to accept the truth of the plaintiffs allegations, *see, e.g., Richards v. Lloyd's of London,* 135 F.3d 1289, 1292 (9th Cir. 1998), and may consider facts outside the parties' pleadings without thereby converting the motion into a constructive summary judgment motion, *see Argueta v. Banco Mexicano, S.A.,* 87 F.3d 320, 324 (9th Cir. 1996).  However, the court must resolve any factual conflicts in favor of the non-moving patty, and must draw all reasonable inferences in the nonmoving party's favor. *See Murphy v. Schneider Nat'l, Inc.,* 362 F.3d 1133, 1138 (9th Cir. 2004).

When deciding a motion to transfer venue, a court "must balance the preference accorded plaintiff's choice of forum with the burden of litigating in an inconvenient forum." *Id.* *See also Creative Tech., Ltd. v. Aztech Sys*., 61 F.3d 696, 703 (9th Cir. 1995).  Traditionally courts have recognized a "strong presumption" in favor of a plaintiff's choice of forum and

placed the burden on the moving defendant to "make a strong showing of inconvenience" in order to upset the plaintiff's choice. *Id.*

## II.        Motion to Amend

Leave to amend is within the discretion of the trial court, but that discretion "should be guided by the underlying purpose of Rule 15(a) which was to facilitate decisions on the merits, rather than on technicalities or pleadings." *In re Morris*, 363 F.3d 891, 894 (9th Cir. 2004) (citation omitted). "A district court may, however, take into consideration such factors as bad faith, undue delay, prejudice to the opposing party, futility of the amendment, and whether the party has previously amended his pleadings." *Id.* (citation omitted). Of these factors, the most important is the potential for prejudice to opposing parties. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31 (1971). While futility alone provides sufficient grounds for denying a motion to amend, *see Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004), undue delay by itself cannot justify denial of a motion to amend. *See Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999). "An outright refusal to grant leave to amend without a justifying reason is . . . an abuse of discretion." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1034 (9th Cir. 2008) (citation omitted).

## DISCUSSION

Although there are numerous motions before the court, the key issues at stake are few. In short, Glacier seeks to shift this litigation to either state or federal court in Montana, while Travelers and Continental resist. More specifically, Glacier argues for a transfer of venue or dismissal for lack of personal jurisdiction, contending that the disputes raised by this declaratory judgment action concern potential liability on a Montana project, involve a Montana

insured (Glacier) and number of Montana subcontractors over whom an Oregon court would lack

personal jurisdiction, and would be decided under Montana law, as provided by Glacier's

subcontract with Interstate.  Travelers and Continental, by contrast, contend that this action

concerns the nature of the insurance policies issued to Interstate in Oregon, would be therefore

governed by Oregon law, and has almost no relation to the underlying liabilities arising from

conduct at the Montana construction project.  These arguments apply to three main legal

doctrines: venue, personal jurisdiction, and declaratory judgment jurisdiction.  Compared to the

forum issue, the other pending motions are relatively minor. Travelers' and Continental's

motions to strike pertain to the admissibility of various statements in Glacier's declarations

concerning the nature of its activities in Oregon.  Travelers' and Continental's motions to amend

seek very limited, housekeeping-type modifications to pleadings.  And Glacier's motion to vacate

seeks to prevent this court's default judgments against Interstate from having any preclusive

effect on Glacier in the parallel Montana actions.

I.          **First Motion to Strike**

          Before addressing the personal jurisdiction and venue issues, I pause to resolve

Travelers's first motion strike portions of Cushman's declaration based on his lack of personal

knowledge.  The challenged aspects of the declaration state that Glacier is a Montana entity, that

Glacier does not do business in Oregon, and that the subcontract between Glacier and Interstate

was negotiated and entered into in Montana.  (Cushman Decl., #55, ¶2.)  Continental joins in

Travelers' Motion, and additionally asks the court to strike the entirety of the declaration– again

for lack of personal knowledge– and to disregard the documents attached as exhibits because

Cushman's declaration is insufficient to authenticate them.  Continental also asks the court to

strike the declaration of Brenda Baldi-Woolhouse because it contains testimony that conflicts with her deposition testimony and documents produced by Glacier.

A witness may not testify on a matter unless the witness has personal knowledge on the matter. Fed. R. Evid. 602. Personal knowledge, however, can be inferred from a declarant's position and the nature of his participation in a matter. *See Barthelemy v. Air Line Pilots Ass'n*, 897 F.2d 999, 1018 (1990). I agree with Travelers that Cushman lacks personal knowledge upon which to base his testimony that Glacier does not do business in Oregon, and that the subcontract between Glacier and Interstate was negotiated and entered into in Montana. Cushman provides no testimony that would indicate he was involved with Glacier's business prior to this litigation or had first-hand exposure to the negotiation of the Glacier-Interstate subcontract. Thus, this portion of Cushman's declaration technically could be stricken. The effect of striking those portions would be meaningless, however, because Glacier also submits declarations from Nathan Steinbeck concerning the negotiation and drafting of the subcontract (Steinbeck Decl., #91, ¶5) and from Brenda Baldi-Woolhouse concerning the extent of Glacier's business in Oregon (Baldi-Woolhouse Decl., #71, ¶4.) Additionally, I do not ultimately rely on Cushman's statements in analyzing the instant motions, because Cushman's general assertions about Glacier's business activities and the Glacier-Interstate subcontract are contradicted by more specific evidence in the record. Accordingly, the motion to strike these portions of Cushman's declaration should be denied as moot.

Next, I disagree with Continental that the remainder of Cushman's declaration need be stricken. The only other statements in the declaration are a list of witnesses who may provide relevant testimony and the purported authentication of three court papers and the Glacier-

Interstate subcontract.  First, Cushman, as Glacier's counsel would likely have personal

knowledge about the relevance of testimony of the listed witnesses.  Even if he did not, Glacier

submits a declaration by Nathan Steinbeck confirming that those witnesses could have testimony

pertinent to the underlying claims.  (Steinbeck Decl., #91, ¶3.)  Also, I do not base any of my

conclusions in disposing of the instant motions on the identity and availability of these witnesses.

Thus, the motion to strike the remainder of Cushman's declaration should also be denied as

moot.

Finally, the court should deny Continental's request to strike Baldi-Woolhouse's

declaration.  Just because declaration testimony is contradicted does not mean it is necessarily

inadmissible.  To the extent that Continental might argue Baldi-Woolhouse's declaration must be

struck as a sham declaration in light of her contrary earlier deposition testimony, I would reject

that contention.  Even if the declaration directly contradicts prior testimony, this court is not

faced with a motion for summary judgment and Glacier therefore has no motivation to make

Baldi-Woolhouse issue a conflicting declaration to create a question of fact of the kind that

would ordinarily defeat summary judgment.   Consequently, the motion to strike Baldi-

Woolhouse's declaration should be denied.

## II.        Motion to Transfer Venue or Dismiss for Lack of Personal Jurisdiction

Glacier requests this court transfer venue to Montana, either because venue in this

district is improper under 28 U.S.C. §1391(a) or because the Montana venue is more convenient

under 28 U.S.C. § 1404(a).   Failing transfer of venue, Glacier requests the court dismiss the

action for lack of personal jurisdiction over Glacier.  I address these two issues in the opposite

order than presented by Glacier, however, because "[t]he question of personal jurisdiction, which

goes to the court's power to exercise control over the parties, is typically decided in advance of venue, which is primarily a matter of choosing a convenient forum" unless "there is a sound prudential justification" for reversing the normal order. *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979). Here, there is no prudential justification for putting off the personal jurisdiction determination because that analysis depends on a straightforward application of established principles.

### A.        Personal Jurisdiction

#### 1.        Waiver

Travelers and Continental first argue that Glacier has waived the defense of lack of personal jurisdiction. Federal Rule of Civil Procedure 12(h)(1)(B) provides that a defendant waives the defense of lack of personal jurisdiction by failing to either "(i) make it by motion under this rule; or (ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course." Fed. R. Civ. P. 12(h)(1)(B). The Ninth Circuit explains that "[a] general appearance or responsive pleading by a defendant that fails to dispute personal jurisdiction will waive any defect in service or personal jurisdiction." *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir.1986), *citing Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982) and Fed.R.Civ.P. 12(h)(1). Indeed, "[j]urisdiction attaches if a defendant makes a voluntary general appearance, as by filing an answer through an attorney . . . ." *Jackson*, 682 F.2d at 1347.

Here, Travelers and Continental contend that both Glacier's initial answer and its amended answer fail to raise the defense of lack of personal jurisdiction. Glacier disagrees, arguing that it raised the defect in personal jurisdiction, albeit inartfully, by praying in its answer "[t]hat this Court transfer jurisdiction to the proper court." (Answer, #46, at 8.) In the very next

line, however, Glacier prays that "should this Court retain jurisdiction," it should also apply

Montana law, permit amendment to add necessary parties, and make various declarations

favorable to Glacier.  *Id.*  Thus, Glacier's use of the term "jurisdiction" in its answer seems to

reference the concept of venue (a proper forum to adjudicate the case) and the court's discretion

to transfer venue to another district, rather than personal jurisdiction (the court's power over the

defendant).  In fact, in the section of the answer entitled "Affirmative Defenses," Glacier raises

"improper venue" and "lack of complete diversity when all indispensable or necessary parties are

properly joined," but not lack of personal jurisdiction over Glacier.  Accordingly, I find Glacier

waived its defense of lack of personal jurisdiction by failing to raise that defense in its answer.

## 2.    Specific Personal Jurisdiction

Even assuming the defense was not waived, I would find the court possesses specific

personal jurisdiction over Glacier.  When no federal statute governs personal jurisdiction, the

district court applies the law of the forum state.  *Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316,

1320 (9th Cir. 1998).  Oregon's long-arm statute creates a standard co-extensive with federal

jurisdictional standards, *see* Or. R. Civ. P. 4L, so a federal court sitting in the District of Oregon

may exercise personal jurisdiction wherever it is possible to do so within the limits of federal

constitutional due process, *see, e.g., Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760

(9th Cir. 1990).

Federal due process jurisprudence requires that to be subject to the personal

jurisdiction of a federal court a nonresident defendant must have at least " 'minimum contacts'"

with the court's forum state such that "the exercise of jurisdiction 'does not offend traditional

notions of fair play and substantial justice.'"  *Schwarzenegger v. Fred Martin Motor Co.*, 374

F.3d 797, 801 (9th Cir.2004), *quoting International Shoe Co. v. Washington*, 326 U.S. 310, 316

(1945).  Two forms of personal jurisdiction are available for application to a nonresident

defendant: general personal jurisdiction[7] and specific personal jurisdiction.

The courts of the Ninth Circuit apply a three-pronged test for determining whether

the exercise of specific personal jurisdiction over a nonresident defendant is appropriate:

> (1) The non-resident defendant must purposefully direct his activities or consummate
> some transaction with the forum or resident thereof; or perform some act by which he
> purposefully avails himself of the privilege of conducting activities in the forum,
> thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's
> forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e.
> it must be reasonable.

*Schwarzenegger,* 374 F.3d at 802, *quoting Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir.1987).

The plaintiff bears the burden of satisfying the first two prongs of the test, whereupon the burden

shifts to the defendant to "'present a compelling case' that the exercise of jurisdiction would not

be reasonable." *Id., quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985).

### a.        Purposeful Availment

---

[7] "For general jurisdiction to exist over a nonresident defendant ..., the defendant must
engage in continuous and systematic general business contacts ... that approximate physical
presence in the forum state." *Schwarzenegger*, 374 F.3d at 801, *quoting Helicopteros Nacionales
de Colombia, S.A. v. Hall*, 466 U .S. 408, 416 (1984) and *Bancroft & Masters, Inc. v. Augusta
Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir.2000). "This is an exacting standard, as it should be,
because a finding of general jurisdiction permits a defendant to be haled into court in the forum
state to answer for any of its activities anywhere in the world." *Id., citing Brand v. Menlove
Dodge*, 796 F.2d 1070, 1073 (9th Cir.1986). Here, Travelers argues that Glacier had continuous
and systematic business contacts with Oregon sufficient to create general jurisdiction.  I disagree,
although I need not conduct a full-blown analysis of general jurisdiction because I find above that
specific personal jurisdiction exists.

Courts analyze the concept of "purposeful availment" instead of "purposeful direction" in contract cases. *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). Purposeful availment occurs when a defendant "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Boschetto*, 539 F.3d at 1016, *quoting Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990). Although the formation of a contract with a nonresident defendant is not alone sufficient to create jurisdiction, purposeful availment exists if "business activities reach out beyond one state and create continuing relationships and obligations." *Id.*, *citing Burger King Corp.*, 471 U.S. at 478, 105 S.Ct. 2174 and *quoting Travelers Health Ass'n v. Commonwealth of Va.*, 339 U.S. 643, 647 (1950); *accord Roth v. Marquez,* 942 F.2d 617, 622 (9th Cir. 1991) (parties' contract supported jurisdiction where the "contract's subject would have continuing and extensive involvement with the forum.")    Thus, courts must look to "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine if the defendant's contacts are " substantial " and not merely "random, fortuitous, or attenuated." *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990), *quoting Burger King*, 471 U.S. at 479, 480.

Here,  I find Glacier's negotiation and execution of its main house subcontract with Interstate created a continuing involvement with Oregon sufficient to satisfy the purposeful availment prong of the personal jurisdiction standard.  Glacier's undeniable visits to and extensive communications with Interstate in negotiating the subcontract are important, but alone are not sufficient for purposeful availment. *See Sher*, 911 F.2d at 1362 (finding that phone calls, letters, and visits to California did not by themselves establish purposeful availment because it

was "not the deliberate creation of a substantial connection with California, nor is it the

promotion of business within California.") (internal quotations omitted).  Importantly, those pre-

contract activities led to a contract requiring Glacier's continuing contact with Interstate in

Oregon and Interstate's substantial performance of contractually required activities within

Oregon.  Baldi-Woolhouse's testimony that the contract was performed only in Montana is

contradicted by the rest of the record.  In fact, Interstate designed, detailed, and fabricated various

parts or systems that were later installed in the Shelter Island residence in Oregon.  Indeed, the

subcontract repeatedly calls for Interstate to "furnish and install" various HVAC or plumbing

parts and equipment, which reasonably includes the design and creation of those systems.

(Cushman Decl., #55, Ex. D, at 39-46).  Furthermore, the 78 change orders negotiated between

Glacier in Montana and Interstate in Oregon during the contract's performance are evidence of

Glacier's "continuing relationships and obligations" with an Oregon business.  *See Burger King,*

*471 U.S. at 473, quoting Travelers*, 339 U.S. at 647.  Additionally, Interstate performed nearly all

of the initial design review contract for Glacier in Oregon.  Thus, Glacier had more than just

"random, fortuitous, or attenuated" contact with Oregon.[8]

### b.        Relation to Forum Activities

            The Ninth Circuit employs a "but-for" standard to determine whether the claim at

issue arose from the defendant's forum-related activities.  *Ziegler v. Indian River Cnty.*, 64 F.3d

470, 474 (1995) ("There is no dispute that 'but for' the contacts between defendants and

California, [plaintiff's] claims would not have arisen").   The but-for test is easily satisfied here.

--------------------------------------------------------

            [8] Even after Glacier stopped working with Interstate, it continued to have direct business
relationships with former Interstate sub-subcontractors in Oregon, such as Siemens.  (McCraken
Decl., #84, Ex. 2 at 16, 87.)

But for Glacier executing a subcontract with Interstate in Oregon requiring Interstate to obtain various insurance policies from Travelers with Glacier as an additional insured, Travelers would not have needed to file this case seeking a declaration that those policies provide no coverage to Glacier for the claims raised in the Arbitration and Flathead County case.

**c.**     **Reasonableness**

Since Travelers and Continental easily established a prima facie showing of jurisdictional facts on the first two elements, the burden shifts back to Glacier to make a compelling showing that exercising personal jurisdiction would be unreasonable.  When evaluating whether exercise of specific jurisdiction is reasonable, the court examines seven factors, including:

> (1) the extent of a defendant's purposeful interjection; (2) the burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Burger King*, 471 U.S. at 476–77.  These factors are mixed, but on the whole support the reasonableness of jurisdiction.

First, Glacier's purposeful injection into Oregon was substantial, including a number of personal visits and a several-year-long business relationship involving hundreds of digital communications and dozens of contract modifications.

Second, there is little or no additional burden for Glacier to defend this action in Oregon.  Glacier's single owner lives in California and often travels in his own private jet; Portland is closer to both Mr. Abbey and Glacier's counsel (located in Olympia, Washington)

Page 23 - FINDINGS AND RECOMMENDATION

than is Missoula, Montana.

Third, there are issues concerning Montana's sovereignty, namely the pending Montana state court decisions, although I address them more fully below in discussing declaratory relief jurisdiction.

Fourth, both Oregon and Montana have some interest in the litigation. Oregon is obviously interested in the adjudication of coverage under insurance contracts executed within this state, while Montana is interested in the potential coverage of a Montana insured for damages allegedly suffered on a Montana construction project.

Fifth, I have some concerns about the efficiency of adjudicating coverage claims pertaining to only a subset of Glacier's insurers in a separate action and of the potential for duplicative and inconsistent fact-finding in several actions; again, I discuss these concerns more below.

Sixth, Travelers and Continental both stress the importance of litigating this dispute in Oregon because the insured, Interstate, is an Oregon company. However, they do not explain why Oregon is a more convenient or effective forum. Glacier argues that this forum will be ineffective because it cannot join all other subcontractors and insurers, many of whom are allegedly only subject to jurisdiction in Montana. But this factor explicitly considers only "plaintiff's" interests, and Glacier has not presented any evidence why Travelers would be better served to litigate elsewhere.

Finally, Montana is an alternative forum where venue is properly laid, notwithstanding Continental's incredible argument that a Montana court would not have personal jurisdiction over Interstate. If Glacier's interactions with Interstate in Oregon suffice for personal

jurisdiction here, Interstate's construction and installation work on the Abbey residence over

several years surely satisfies the minimum contacts test for personal jurisdiction.  Overall,

Glacier does not present compelling evidence why it would be unreasonable under federal

constitutional due process jurisprudence for this court to exercise personal jurisdiction.

Therefore, Glacier's motion to dismiss the action for lack of personal jurisdiction should be

denied.

> **B.**      **Venue**

> **1.**         **Proper Venue**

Under 28 U.S.C. § 1391(a), a civil action based on diversity jurisdiction may be

brought only in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same
> State, (2) a judicial district in which a substantial part of the events or omissions
> giving rise to the claim occurred, or a substantial part of property that is the subject of
> the action is situated, or (3) a judicial district in which any defendant is subject to
> personal jurisdiction at the time the action is commenced, if there is no district in
> which the action may otherwise be brought.

28 U.S.C. § 1391(a).  Glacier does not address all three potential bases for venue.  Instead,

Glacier apparently focuses only on § 1391(a)(2), contending that venue is improper because

"Oregon does not play any part in the acts or omissions giving rise to the claim that was

arbitrated between Glacier and [Interstate]," and because "Oregon has no connection to the

property upon which the construction subtract at issue in that arbitration was performed."  (Br.,

#54, at 6.)  Travelers counters that the Travelers insurance policies under which Glacier claims

coverage were negotiated and purchased in Oregon by Interstate.

There is some dispute among the federal courts in deciding how to apply §

1391(a)(2) in insurance coverage actions.  *See Malveaux v. Christian Bros. Servs.*, 753 F. Supp.

2d 35, 39 (D.D.C. 2010).  Some courts, including several in this circuit, focus only on the

underlying events for which coverage is sought.  *See e.g., Carolinas Cas. Co. v. Data*

*Broadcasting Corp.*, 158 F.Supp.2d 1044, 1047 (N.D.Cal. 2001) ("In an insurance coverage

action, to establish venue via section 1391(a)(2), a court looks to the underlying events for which

coverage is sought."); *Columbia Cas. Co. v. SMI Liquidating*, NO. C 10-02057 CRB, 2010 WL

3037242, at *3 (N.D.Cal. Jul 30, 2010).  Others base the venue analysis on the events relating to

the insurance contract itself.  *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2nd Cir.

2005).  Yet others find a proper venue either where arguably covered events occurred or where

the insurance contract was formed.  *See Malveaux*, 753 F. Supp. 2d at 39; *Clarendon Nat'l Ins.*

*Co. v. T.M.I. Enters., LLC*, No. 07–1637, 2008 WL 3838025, at *3 (W.D.La. Aug. 14, 2008).  I

prefer this third approach.  Since Interstate negotiated and purchased the relevant insurance

contracts in Oregon, venue is appropriate in this district.  Additionally, because Glacier seeks

coverage for defense in the two underlying Montana legal proceedings (the Arbitration and the

Flathead County case) and for indemnification for its alleged negligence in the Abbey residence

construction in Montana, venue is also proper in Montana.

    Even if venue were improper in Oregon under Section 1391(a)(2), Section 1391(a)(3)

provides an alternative basis for venue because this district is one in which "any defendant is

subject to personal jurisdiction at the time the action is commenced."  28 U.S.C. § 1391(a)(3).

At least one of the defendants – Interstate– was subject to personal jurisdiction in this district at

the time the action commenced for many reasons, not the least of which was that it was served in

this district.  (Affidavit of Service, #19.)  Glacier counters that the original action was

"completed" when the district court entered default judgments against Interstate, suggesting that amending to add Glacier effectively initiated a new action, in which venue is no longer properly laid. I disagree. Travelers' claim for recoupment against Interstate is still unresolved. Further, the issues of coverage under Interstate's policies are still the same as at the outset of this action, even though default judgment has been entered as to Interstate. In sum, venue is properly laid in Oregon under § 1391(a)(2) or, alternatively, § 1391(a)(3).

### 2.        Convenient Venue

Glacier contends that even if venue is proper in this district, the court should transfer venue to the federal court in Montana under 28 U.S.C. § 1404(a). Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. §1404(a). However, a party seeking transfer must make "a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). Before transferring pursuant to § 1404(a), the Court should consider public factors relating to "the interest of justice" and private factors relating to "the convenience of the parties and witnesses." *Decker Coal*, 805 F.2d at 843. Such factors may include: (1) the location where relevant agreements were negotiated and executed; (2) the state that is most familiar with the governing law; (3) the plaintiff's choice of forum; (4) the parties' respective contacts with the forum; (5) the contacts relating to the plaintiff's cause of action in the chosen forum; (6) the differences in the costs of litigation in the two forums; (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses; (8) the ease of access to sources of proof; (9) the presence of a forum

Page 27 - FINDINGS AND RECOMMENDATION

selection clause; and (10) the relevant public policy of the forum state, if any.  *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–499 (9th Cir. 2000).  I consider each factor in turn.

First, the relevant agreements in this declaratory relief action are the Travelers and Continental insurance policies under which Glacier claims coverage.  Since the record suggests that both sets of policies were negotiated and executed by Interstate in Portland through its insurance broker, this factor supports venue in Oregon.

Second, despite Glacier's arguments that Montana law clearly governs this case and Travelers' arguments that Oregon law clearly governs, the choice of law question will likely be non-trivial and must be resolved at a later stage in the proceedings.  The subcontract between Glacier and Interstate provides only that the subcontract itself should be interpreted under and governed by Montana law.  (Cushman Decl., #55, Ex. at 20) (Section 4.6).  Nowhere does it state that any insurance policy required by the subcontract also falls under the same requirement.  Indeed, the insurance contracts at issue are not before the court, so the court cannot determine now if any contain a choice of law provision.   Moreover, Oregon's choice of law analysis considers several factors, including the various states' interests in the dispute, the nature of the conflict between the substantive laws of the states, and the forum's public policies.  *See Lilienthal v. Kaufman*, 239 Or 1, 395 P2d 543 (1964).  This factor is neutral at this time.

Third, although the plaintiff's choice of Oregon as a forum is one consideration, less deference is due to a plaintiff's forum choice when it has little connection to that forum.  *See Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1157 (S.D. Cal. 2005) (collecting cases).  Here, Travelers and Continental are not Oregon companies and have little connection with Oregon except for issuing insurance policies covering an Oregon insured.  This factor therefore supports

Page 28 - FINDINGS AND RECOMMENDATION

a forum in Oregon, although not strongly.

Fourth, as described above, the insurer parties have some contacts with Oregon and none with Montana, while Glacier has some contacts with Oregon and much more significant contacts with Montana. This factor favors venue in Oregon, since that is the venue where all parties have at least some contact.

Fifth, some of the contacts relating to the cause of action occurred in Montana, since that is the state where the events which either do or do not give rise to insurance coverage occurred. Others, however, relate to Oregon, which is the state where the insurance coverage was negotiated and written. This factor is neutral.

Sixth, there is little difference in the cost of litigation in either forum.

Seventh, I agree with Glacier that some subcontractors who may offer relevant testimony about their conduct and the nature of the property damage may not be compelled to testify in Oregon because they are exclusively based in Montana. Nathan Steinbeck describes some of these parties in his declaration. (Steinbeck Decl., #91, ¶3.) However, it is unclear at this early stage in the proceedings whether such compelled testimony about the nature of the damage will even be necessary, given the possibility that this case may be resolved as a matter or law on summary judgment based on the language of the insurance policies. This factor therefore favors Glacier, but only slightly.

Eighth, for the same reasons described in the previous factor, proof of conduct at the construction site may be more accessible if the venue is Montana than Oregon.

Ninth, because the court cannot discern whether a forum selection clause was included in the various insurance contracts that are at issue here, this factor is neutral.

Page 29 - FINDINGS AND RECOMMENDATION

Tenth, as I mentioned previously, both states possess interests in this controversy that could influence a policy-based decision on venue.

Overall, the balance of factors weigh slightly in favor of Oregon as the forum most convenient to the parties and witnesses and appropriate for a just resolution of this dispute. Certainly, Glacier has not made a strong showing of inconvenience to warrant upsetting Travelers' choice of forum in this district. Glacier's motion to transfer venue should therefore be denied.

III.    **Glacier's Oral Motion for the Court to Decline to Exercise Declaratory Relief Jurisdiction**

Glacier makes an oral motion that this court should decline to exercise declaratory relief jurisdiction because the Montana state court action in Lake County is the only forum in which all claims can be effectively resolved. The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, except [specified tax, bankruptcy, anti-dumping or free trade cases] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The district court has discretion whether to declare rights under §2201(a), since the Declaratory Judgment Act "gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so." *See Dizol*, 133 F.3d at 1223, *quoting Public Affairs Associates v. Rickover*, 369 U.S. 111, 112 (1962). In *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491 (1942), the Supreme Court offered guidance on when a district court should exercise its discretion to hear a case under the Declaratory Judgment Act. The so-called *Brillhart* factors dictate that "the district court should

Page 30 - FINDINGS AND RECOMMENDATION

avoid needless determination of state law issues; it should discourage litigants from filing

declaratory actions as a means of forum shopping; and it should avoid duplicative litigation."

*Dizol*, 133 F.3d at 1225.  The Ninth Circuit has also suggested additional considerations, such as:

> whether the declaratory action will settle all aspects of the controversy; whether the
> declaratory action will serve a useful purpose in clarifying the legal relations at issue;
> whether the declaratory action is being sought merely for the purposes of procedural
> fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory
> action will result in entanglement between the federal and state court systems. In
> addition, the district court might also consider the convenience of the parties, and the
> availability and relative convenience of other remedies.

*Id.* at 1225 n.5 (quoting *American States Ins. Co. v. Kearns*, 15 F.3d 142, 145 (9th Cir. 1994) (J.

Garth, concurring).

Some circumstances, such as the existence of a parallel state court proceeding

pertaining to the same coverage issues, weigh against exercising jurisdiction.  One Ninth Circuit

decision states that a parallel state court action "*involving the same issues and parties* pending at

the time the federal declaratory action is filed," creates a presumption against the district court

exercising jurisdiction.  *Dizol*, 133 F.3 at 1125 (emphasis added). "The pendency of a state court

action does not, of itself, require a district court to refuse federal declaratory relief.  Nonetheless,

federal courts should generally decline to entertain *reactive* declaratory actions."  *Id.* (emphasis

added) (internal citations omitted).

However, not all declaratory relief actions filed in federal court are reactive.  If "there

was no state action pending when [the insurer] filed its declaratory relief action," the district

properly exercises jurisdiction.  *Aetna Cas. and Sur. Co. v. Merritt*, 974 F.2d 1196, 1199 (9th

Cir. 1992) (district court properly exercised jurisdiction when insurer filed declaratory judgment

action in federal court on coverage issues and the insureds filed an action in state court one

month later for a declaration that the insurer was liable).  Even so, the order of filing may not be

of paramount importance, since the Ninth Circuit has observed that when both parties seek

declaratory relief, the fact that one party "won the race to the courthouse by several days does not

place it in a preferred position."  *Huth v. Hartford Ins. Co. of the Midwest*, 298 F.3d 800, 804

(9th Cir. 2002) (observing that the Supreme Court's holding in *Wilton v. Seven Falls Co.*, 515

U.S. 277, 279-280 (1995) suggests that "the order of filing is legally insignificant").

      Other circumstances counsel in favor of exercising jurisdiction.  For example, "when

other claims are joined with an action for declaratory relief (e.g., bad faith, breach of contract,

breach of fiduciary duty, rescission, or claims for other monetary relief), the district court should

not, as a general rule, remand or decline to entertain the claim for declaratory relief."  *Dizol*, 133

F.3d at 1225, *citing Chamberlain v. Allstate Ins. Co.*, 931 F.2d 1361, 1367 (9th Cir.1991).  This

is because the district court has an obligation to entertain claims for "bad faith, breach of

contract, breach of fiduciary duty and rescission," which have an independent basis for federal

diversity jurisdiction.  *Id.* at 1225 n. 6.   Additionally, "[i]f a federal court is required to

determine major issues of state law because of the existence of non-discretionary claims, the

declaratory action should be retained to avoid piecemeal litigation." *Id.*, *citing Chamberlain*, 931

F.2d 1361, 1367-1368.

      Here, several factors indicate that exercise of jurisdiction under the Declaratory

Judgment Act would be proper.  First, this action is not the type of reactive declaratory judgment

action where federal courts should decline jurisdiction.  Travelers initiated this action against

Glacier in July 2011, while Glacier filed the Lake County case several months later in September

2011.  Indeed, the Lake County case appears to react to the filing of this federal action, not the

Page 32 - FINDINGS AND RECOMMENDATION

other way around.  As such, declining to exercise jurisdiction merely because of the existence of

the later-filed Lake County case would only reward Glacier's apparent attempt to evade the

federal courts and encourage other federal declaratory relief defendants to initiate duplicative

cases in a favorable state court.

Moreover, the existence of additional non-declaratory relief claims weighs in favor of

exercising jurisdiction.   Travelers and Continental both plead recoupment of defense costs and

allocation claims.  (Second Amend. Compl., #40, ¶¶24-26, 35-36); (Answer, #48, ¶¶24-26, 35-

36.)  Also, although not explicitly pled, Glacier appears to allege a cross claim against Interstate

for defective design work.  (Answer, #46, at 7) ("To the extent the work that failed or was done

defectively failed or became defective due to design errors, Interstate is also liable for that design

work, and Interstate, and in turn the design professionals utilized by Interstate, should be held

liable for the costs of correction and loss of use occasioned thereby.")  The federal courts have an

independent jurisdictional basis to entertain these additional monetary relief claims, and the

declaratory relief claims along with them. *See Dizol*, 133 F.3d at 1225.

Further, the composition of the Lake County action does not necessarily require this

court to decline to exercise jurisdiction.  Glacier contends that retaining jurisdiction here would

create duplicative insurance coverage actions, since the Lake County case would have to proceed

anyway to determine the duties of other alleged insurers besides Travelers and Continental, even

if the instant case proceeded in this district.  This is true, but only in a limited sense.  As

Travelers points out, each of Glacier's insurance coverage disputes stand alone, since Glacier

seeks coverage as the additional insured of several separate insurance policies obtained by

various subcontractors.  For instance, here Glacier's purported coverage stems from Interstate's

Page 33 - FINDINGS AND RECOMMENDATION

policies written by Travelers and Continental.  That coverage is completely independent from

coverage purchased by another subcontractor naming Glacier as an additional insured.  And any

apportionment for Interstate's potential liability would occur between Travelers, Continental, and

Interstate, but would not involve any of Glacier's other insurers.  Thus, retaining jurisdiction here

would not eliminate the need for the Lake County case to adjudicate coverage issues involving

Glaciers' other alleged insurers based on other insurance policies.  At the same time, retaining

jurisdiction would not lead to "duplicative litigation" concerning Glacier's coverage by

Interstate's insurers, nor would it fail to "settle all aspects of the controversy" between Glacier,

Travelers, and Continental.  *See Dizol*, 133 F.3d at 1225, n.5.

Glacier also argues that the Lake County case involves a number of other

subcontractor defendants necessary to completely resolve all insurance coverage issues, some of

whom cannot be joined in this federal action in Oregon.  Indeed, Nathan Steinbeck declares that

several of the Lake County defendants– Glazier Drilling, Davis Pipe & Machinery– were

Montana corporations and their operators were likewise Montana citizens.  Yet, it is unclear why

Glacier has even named those other subcontractors as defendants on common law indemnity

claims in the Lake County case.  Glacier claims to be an additional insured under insurance

policies purchased by those subcontractors.  (Cushman Decl., #55, Ex. C at ¶29.)  But when

asked at oral argument why the subcontractors themselves were named as defendants, Glacier's

counsel could not provide a satisfactory explanation.  Since the liability issues between Glacier

and its subcontractors are already being litigated in the Flathead county case, if Glacier had

wanted to seek indemnity from its subcontractors, perhaps the more effective approach would

have been to assert cross claims against its subcontractors in the Flathead county action.  Of

Page 34 - FINDINGS AND RECOMMENDATION

course, it is not this court's role to dictate Glacier's litigation strategy in state court or to guide

the state courts in finding the proper forum for Glacier's various claims.  Nevertheless, Glacier's

inability to explain why the Montana subcontractors named in the Lake County case are

necessary for resolution of the insurance coverage disputes suggests that Glacier structured the

Lake County case as it did to gain some procedural advantage.  Declining to exercise jurisdiction

in deference to that action would only encourage what appears to be "procedural fencing" by

Glacier.

        Finally, at this stage, it is too early to determine whether exercising jurisdiction will

require duplication of factual determinations and state law liability issues that will be made in the

Flathead County case, which predates this federal action.  *See Dizol*, 133 F.3d at 1225 ( urging

district courts to "avoid needless determination of state law issues").   As one leading treatise

notes, "[a] different analysis [from that pertaining to reactive coverage actions] may apply where

the federal declaratory relief action relates to a state court tort action against the insured by the

injured party, to which the insurer is not a party." William W. Schwarzer et al., *Federal Civil*

*Procedure Before Trial*: *California and 9th Circuit Editions*, §10:56 (rev. 2011).   Indeed, in

addressing an insurer's summary judgment motion on its declaratory relief claim, one court in

this district declined to exercise jurisdiction under the Declaratory Judgment Act to determine

whether the insurer had a duty to indemnify because the state court had yet to resolve factual

disputes concerning liability that would be central to the issue of indemnity.  *Travelers Prop.*

*Cas. Co. of Am. v. Martella*, No. CV-04-176-ST, 2004 WL 1375283, at *6 (D. Or. June 18,

2004) (denying summary judgment on duty to defend issue on its merits but denying summary

judgment motion on duty to indemnify as premature because underlying liability action in state

Page 35 - FINDINGS AND RECOMMENDATION

court had not yet concluded and staying the action).

Here, however, the court is not yet faced with a motion for summary judgment concerning the duty to indemnify and thus cannot ascertain whether or not resolution of this action will require factual determinations that would duplicate those being made in the Flathead County case.  Travelers contends that this court will be able to resolve the duty to indemnify issue as a matter of law based only the pleadings of the Flathead County case, without having to resolve factual disputes that are being adjudicated in Flathead County.  This may be, although I note that there are certainly instances when the duty to indemnify depends on the facts proved at trial on liability.  *See Ledford v. Gutoski*, 319 Or. 397, 403, 877 P.2d 80 (1994) ("Even when an insurer does not have a duty to defend based on the allegations in the initial complaint, the facts proved at trial on which liability is established may give rise to a duty to indemnify if the insured's conduct is covered.")  Thus, it is simply too early to tell whether this action will require the type of duplicative fact-finding that weighs in favor of declining the exercise of declaratory relief jurisdiction.  The court can address that concern at a later time if such factual overlap becomes apparent, either upon a further motion by Glacier or *sua sponte*[9].

A.          **Travelers' and Continental's Second Motion to Strike**

Travelers and Continental move to strike portions of the declarations of Jon Cushman and Nathan Steinbeck Glacier submitted along with its supplemental brief on the issue of the court's exercise of declaratory relief jurisdiction.  Since I do not rely on the challenged aspects of those declarations in recommending that Glacier's oral motion be denied, this motion to strike

_____

[9] If the court decides to decline to exercise jurisdiction in the future, it likely would stay the instant action until the conclusion of the Flathead County case, rather than dismiss the action outright.

Page 36 - FINDINGS AND RECOMMENDATION

should be denied as moot.

## IV.        Motions to Amend

### A.        Travelers' Motion to File Third Amended Complaint

As currently plead, the third claim of Travelers' Second Amended Complaint seeks a declaration that "they do not have any obligation to *indemnify* Glacier . . . under the Travelers Policies for the Abbey/Land Claims."  (Sec. Amend. Compl., #40, ¶33) (emphasis added).   At the time that pleading was filed– July 11, 2011– Abbey/Land had not yet brought any claims against Glacier, since Glacier was then still a co-plaintiff with Abbey/Land in the Flathead County case.  Thus, Travelers only sought a declaration of no duty to indemnify, since no claims had been filed against Glacier requiring defense.  Since then, Abbey/Land brought in Glacier as a defendant asserting claims for property damage and loss of use.  Consequently, Travelers seeks to amend its complaint to ask for a declaration that, in addition to having no duty to *indemnify* Glacier, Travelers also has no duty to *defend* Abbey/Land's claims brought against Glacier.  *See* (Prop. Third Amend. Compl., #57-1, ¶33) ("they do not have any obligation to *indemnify or defend* Glacier . . . under the Traveler's Policies for the Abbey/Land Claims.") (emphasis added).  In response, Glacier argues that Travelers' motion is merely an attempt to salvage venue in Oregon and this court's personal jurisdiction over Glacier, but does not address the limited nature of Travelers' proposed changes or describe why they should not be allowed.

I find that Travelers' proposed amendment is not futile, especially because this court can adjudicate whether Travelers has a duty to defend based on the pleadings of the Flathead County case, without interfering with or duplicating the fact-finding in that action.  *See Gebrayel v. Transamerica Title Ins. Co.*, 132 Or.App. 271, 275, 888 P.2d 83(1995) ("The scope of the duty

Page 37 - FINDINGS AND RECOMMENDATION

to defend is determined by comparing the terms of the insurance policy with the allegations of

the complaint, to determine whether the allegations of the complaint show that there is a

possibility that the policy provides coverage for the claims made. Any facts not alleged in the

complaint are irrelevant in determining the existence of the duty to defend.") (internal citations

omitted).  Moreover, there appears to be no bad faith or undue delay by Travelers, since

Travelers brought this motion on November 15, 2011, almost immediately after Glacier tendered

the Second Amended Complaint in the Flathead County Suit on September 28, 2011 and one of

the Travelers defendants undertook defense under a reservation of rights on November 9, 2011.

Finally, Glacier presents no reasons why it would be prejudiced by this amendment.  Travelers'

motion should therefore be granted.

### B.    Continental's Motion to Amend Cross-Claim

Continental also seeks to amend to its cross-claim against Glacier based on the new

operative complaint in the Flathead County case.  In this case, Continental previously obtained a

default judgment against Interstate clarifying that Continental had no obligation to defend or

indemnify Interstate against any claims asserted in the Flathead County suit or the arbitration

proceeding. (#32.)  After obtaining that default judgment, Abbey/Land filed its Second Amended

Complaint in the Flathead County case adding Glacier as a defendant but not materially altering

claims against Interstate.  (Cushman Decl., #55, Ex. B.)  However, because of this new operative

complaint, "in an abundance of caution" Continental seeks leave to amend its cross-claim and

revive its request for declaratory relief as to Interstate to make certain that any eventual judgment

against Interstate "clearly applies to the claims in the Second Amended Complaint" in the

Flathead County suit.  (Br., #63, at 2.)

I am not entirely certain Continental's motion to amend is necessary, as the district court's default judgment does not specify which complaint in the Flathead County case was operative at the time the judgment was entered.  Nevertheless, there appears to be no harm in allowing Continental's proposed amendment, as it will only clarify the record. Continental will likely repeat the steps it already went through, seeking an entry of default and then a default judgment.  If the district court wishes to avoid this needless repetition, it could simply enter an order clarifying that the default judgment (#32) is still in force, even though a new operative complaint has been filed in the underlying Flathead County action.

## V.        Motion to Vacate Default Judgment

Glacier moves to have the district court's default judgment against Interstate vacated pursuant to Fed. R. Civ. P. 60(b).   Rule 60(b) provides:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

First, it is uncertain whether Glacier even has standing to bring a motion to vacate a

Page 39 - FINDINGS AND RECOMMENDATION

default judgment entered against Interstate.  The Ninth Circuit has explained that because Rule 60(b) provides relief from a judgment on a motion by "a party or his legal representative," only a party to the original action or someone in privity with the party may bring a Rule 60(b) motion. *See In re Lovitt*, 757 F.2d 1035, 1040 (9th Cir. 1985).  A sensible reading of Rule 60(b) would seem to provide relief from a court's judgment to only the party *against which the judgment was entered*, not any entity such as Glacier that is a party to the action but was not the subject of the court's judgment.

Second, even assuming Glacier has standing to request the default judgment be vacated, Glacier does not clearly articulate why the default judgment should be vacated.  Glacier states that Rule 60(b)(5) and (6) apply.  Glacier does not link its arguments to Rule 60(b)(5), but apparently offers generalized argument under the catch-all provision of Rule 60(b)(6).  Glacier contends that the default against Interstate was inappropriate because it was taken prior to Glacier being added as a defendant and was thus entered without affording Glacier an opportunity to object, despite that Glacier clearly had an interest in Interstate's insurance policies as an additional insured.  Glacier, however, does not cite any authority supporting that position.

Third, Glacier's concern with the default judgments seems to be rooted in a misunderstanding about the effect of such defaults.  Glacier makes clear that it seeks to have the court vacate the default judgement to avoid that judgment acquiring some preclusive effect in other proceedings.  (Br., #73, at 9) (Glacier argues that the insurers parties in this action are "trying to use the default judgments to deny coverage beyond this case.").  In the Lake County case, Continental has asserted an affirmative defense against Glacier's declaratory relief claims that this court's default judgment for Continental against Interstate bars Glacier's claims under

the doctrine of *res judicata.* (Scuderi Decl., #74, Ex. A, at 8) ("To the extent Glacier seeks

coverage for or recovery of the judgment against [Interstate] in favor of Glacier . . . [Continental]

asserts that res judicata bars this claim as another court has found [Continental] has no obligation

to indemnify that award."). It seems that Continental invokes the aspect of *res judicata* that is

more accurately called issue preclusion or collateral estoppel, which refers to the "binding effect

of a judgment as to matters actually litigated and determined in one action on later controversies

between the parties involving a different claim from that on which the original judgment was

based." Blacks Law Dictionary (rev. 2009).

It is well-settled in federal courts, however, that a default judgment does not warrant

issue preclusion when the default is entered without further inquiry after a defendant fails to

answer. *See* Wright and Miller, 18A Fed. Prac. & Proc. § 4442 (2d ed., rev. 2011) n.5 (citing

*Travelers Ins. Co. v. McElroy*, 359 F.2d 529, 533-534 (9th Cir. 1966)). Oregon and Montana law

also follow the same rule. *See Drews v. EBI Companies*, 310 Or. 134, 140, 795 P.2d 531 (1990)

(issue preclusion only bars future litigation of an issue that has been "actually litigated and

determined by a valid and final judgment, and the determination is essential to the judgment.");

*Butler v. Brownlee*,152 Mont. 453, 457, 451 P.2d 836 (1969) (issue preclusion requires a final

judgment on the merits, which occurs only where the issue was "actually litigated and adjudged

as shown on the face of the judgment.")*.* Thus, the district court's entry of a default judgment

against Interstate will not likely be given preclusive effect on the issue of whether Continental is

required to indemnify Glacier as an additional insured for claims arising from this project. For

all the reasons described above, Glacier's motion to vacate should be denied.

## CONCLUSION

Page 41 - FINDINGS AND RECOMMENDATION

For the reasons stated above, Travelers' motion to strike portions of a declaration filed in support of Glacier's motion to transfer (#79), informally joined by Continental in its response briefing (#81), should be denied in part as moot and denied in part on the merits; Glacier's motion for transfer of venue or alternative motion to dismiss for lack of personal jurisdiction (#54) should be denied; Glacier's oral motion for the court to decline to exercise declaratory relief jurisdiction over this action should be denied with leave to renew at a later stage in the proceedings; Travelers' and Continental's joint motion to strike portions of declarations filed by Glacier in support of its oral motion (#111, #117) should be denied as moot; Travelers' motion to file a third amended complaint (#57) should be granted; Continental's motion to amend its cross-claim (#62) should be granted; and Glacier's motion to vacate a default judgment against Interstate (#73) should be denied.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 29th day of March, 2012.

/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge

Page 42 - FINDINGS AND RECOMMENDATION